T. Smith & Son, Inc. v. Commissioner.
T. Smith & Son v. Commissioner
Docket No. 108417.
United States Tax Court
1943 Tax Ct. Memo LEXIS 127; 2 T.C.M. (CCH) 740; T.C.M. (RIA) 43412; September 7, 1943
*127 Edward Rightor, Esq., and Edward S. Rittler, C.P.A., for the petitioner. Frank B. Schlosser, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's income taxes for the years 1938 and 1939 in the amounts of $16,829.97 and $28,934.66, and excess profits taxes for the same years of $394.89 and $1,689.40, respectively. The sole question presented for our consideration is whether or not the petitioner was liable in either of the taxable years here involved for the tax imposed by section 102 of the Revenue Act of 1938 and the Internal Revenue Code. Respondent has determined that petitioner was availed of during the taxable years for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting the earnings and profits to accumulate, and that such accumulations were beyond the reasonable needs of the business. Findings of Fact Petitioner was incorporated under the laws of Louisiana in 1918 with an authorized capital stock of $100,000, for the purpose of engaging in the stevedoring business in and about the port of New Orleans, Louisiana, where its principal place *128 of business is located. The corporation succeeded a partnership composed of Terence Smith, now deceased, and his son, Wm. S. Smith, president of petitioner. At that time, only $34,200 of the authorized capital stock was issued. The remaining shares of the par value of $65,800 were issued as a stock dividend in 1936. During the years in question, Wm. S. Smith owned 998 of the 1,000 shares of capital stock of petitioner, the remaining two shares being held by his wife and an employee of the corporation. In 1938 and 1939, petitioner handled about 50 percent of the stevedoring business at the port of New Orleans. The business is not seasonal in nature, but remains fairly constant throughout the year. In addition to stevedoring, which consists principally in loading and unloading ships, petitioner engaged in every phase of the business, such as contracting for heavy lifts with railroads and contractors, renting derricks and other equipment, and ship fitting. It employed loading gear, tools, barges and derrick barges, and owned four derricks in 1938, and acquired an additional one in 1939. From 1934 on through the years involved here, William S. Smith, president of petitioner, noticed *129 that the Japanese ships loaded by petitioner, were equipped with gun emplacements, and, beginning about 1937, noted that the character of goods shipped to Germany changed from raw materials to manufactured goods. From his observations, he believed that war was inevitable. About 1938, the Dock Board at New Orleans decided to abandon its coal tipple, and it requested petitioner, as well as other local stevedores, to provide facilities for handling bulk cargo which would enable the Port of New Orleans to compete with other ports, notably Mobile. Petitioner and others agreed to expand their facilities and provide equipment necessary to accomplish that purpose, and, pursuant to that agreement, petitioner began to acquire additional cranes, derricks and barges. The change in the nature of certain materials handled by petitioner also necessitated a change in its equipment and methods of handling, since manufactured goods require more careful handling, and as a result of these changes, petitioner has built and used 35,000 pallettes, or sling boards upon which such goods are placed for loading and shipment, at a cost of $4.50 each. During the years 1938 to 1941, inclusive, petitioner made *130 the following purchases of equipment: 1938
1939
1940
1941
Tools and Gear
$40,090.07
$ 47,583.79
$ 52,122.10
$ 40,475.53
Derrick Barge "William"
63,604.36
Derrick Barge "Jim"
64,216.94
Boat "Lake Ellijay"
11,470.00
Derrick Barge "Mickey"
78,304.61
Total
$40,090.07
$111,188.15
$127,809.04
$118,780.14 These purchases totaled $397,867.40. The gross volume of petitioner's business, the cost of its equipment, and accrued depreciation thereon, for the years 1933 to 1941, inclusive, were as follows: Gross Volume
Equipment
Depreciation
of Business
Owned
Reserve
1933
$ 601,257.27
$181,315.09
$ 55,573.82
1934
771,626.15
184,590.79
67,505.23
1935
948,833.27
194,562.97
79,024.15
1936
858,008.59
202,311.49
92,678.79
1937
1,227,432.60
223,889.37 *
86,561.19
1938
1,235,438.34
271,713.50
103,940.47
1939
1,321,390.74
380,748.50
122,589.57
1940
1,767,583.41
501,145.76
152,458.55
1941
1,677,395.85
643,941.10
219,541.91
At times, petitioner's business has extended as far up the river as Baton Rouge, 140 miles away, and as *131 far down the river as the mouth, but 99 percent of its business was done in the port of New Orleans. Petitioner employed six or seven hundred men during the tax years, and its annual payroll was between $700,000 and $800,000. It was occasionally necessary for petitioner to transport a considerable number of men across the river in order to carry on petitioner's business. The hazards of accidents to employees with resulting claims for compensation, of damage to cargoes loaded with resulting claims, and labor troubles which had cost petitioner about $30,000 in 1935, constituted the major hazards of the business. Petitioner was its own insurer for workmen's compensation up to $5,000 in any single case, but it carried insurance protecting it against claims in excess of $5,000 on an individual claim, and up to $100,000 in the event of a general catastrophe. In order to qualify as self-insurer, it was necessary for petitioner to deposit bonds with the government, and to furnish satisfactory financial statements. Bonds belonging to William S. Smith individually of a value of $15,000 in 1938, and $25,000 in 1939, were used for this purpose. In 1938 and 1939, there were spent for claims *132 and self-insurance the sums of $49,911.69 and $47,999.11, respectively. The book net profit, taxable net income, and annual surplus account, and the cash dividends paid by petitioner, were as follows: Book
Taxable
Surplus
Cash
Year
Net Profit
Net Income
As Adjusted
Dividends
1934
$ 3,627.78
$ 9,503.28
$184,461.03
none
1935
25,711.36
27,704.46
182,583.02
$27,360.00
1936
22,080.65
22,956.37
129,622.68
5,000.00
1937
65,296.49 *
92,278.44
176,035.47
20,000.00
1938
82,020.50
82,806.64
241,483.34
none
1939
137,657.03
147,495.82
349,258.86
10,000.00
Comparative balance sheets of petitioner as of December 31, of 1937, 1938, and 1939, are as follows: ASSETS
12-31-37
12-31-38
12-31-39
Cash
$135,849.08
$338,124.79
$246,992.00
Accounts receivable
134,545.22
9,312.06
122,380.12
Inventory of tags
90.31
Land
2,500.00
2,500.00
2,500.00
Derrick Barge "Terence"
72,663.64
72,663.64
72,663.64
Derrick Barge "Pelican"
23,000.00
23,000.00
23,000.00
Tools and Gear
57,557.72
97,647.79
145,231.58
Autos and Trucks
9,059.31
11,453.03
9,299.88
Furniture and Fixtures
1,534.25
1,534.25
1,534.25
Frozen Bank Deposits
6,994.36
6,994.36
6,994.36
Stocks owned
2,015.50
2,015.50
2,015.50
Barge "William"
63,604.36
Dredge "Mammoth"
70,074.45
65,414.79
65,414.79
$515,793.53
$630,750.52
$761,630.48
LIABILITIES
Accounts Payable: Lumber Purchases
$ 79,985.24 *
$ 85,487.42 *
$ 88,167.64 *
Officers and Stockholders
41,096.94
72,637.41
60,113.68
Reserve for depreciation
86,561.19
103,940.47
122,589.57
Accrued taxes
32,114.69
27,201.88
41,500.73
Capital stock
100,000.00
100,000.00
100,000.00
Surplus
176,035.47
241,483.34
349,258.86
$515,793.53
630,750.52
761,630.48
*133 Petitioner's cash on hand remained fairly constant throughout 1938 and 1939. The accounts payable due officers and stockholders, shown above, represent to a large extent undrawn officers' salaries. Comparative balance sheets of petitioner as of December 31, 1940 and December 31, 1941, are as follows: ASSETS
12-31-40
12-31-41
Cash
$ 249,860.98
$ 268,680.94
Accounts Receivable
314,415.10
118,327.20
Stocks Owned
2,015.50
2,015.50
Frozen Bank De-
posits
5,962.11
5,962.11
U.S. Defense Bonds
7,400.00
Derrick Barge "Ter-
ence"
72,663.64
72,663.64
Derrick Barge "Peli-
can"
23,000.00
23,000.00
Dredge "Mammoth"
65,414.79
65,414.79
Derrick Barge "Wil-
liam"
63,604.36
63,604.36
Derrick Barge
"James"
64,216.94
64,216.94
Boat "Lake Elli-
jay"
11,470.00
11,470.00
Tools and Gear
187,353.68
246,499.89
Autos and Trucks
$ 11,488.00
$ 17,232.52
Furniture and Fix-
tures
1,534.35
1,534.35
Land
2,500.00
2,500.00
Derrick Barge
"Mickey"
78,304.61
Total
$1,075,499.45
$1,048,826.85
LIABILITIES
Accounts Payable
$ 189,057.21
$ 101,028.63
Accounts Payable -
Lumber Purchases
73,229.08
33,664.12
Due to Officers and
Stockholders
81,003.76
34,121.37
Accrued Taxes
17,388.12
14,147.43
Reserve for Income
Taxes
35,256.18
53,087.89
Total Liabilities
$ 395,934.35
$ 236,049.44
Reserve for Deprecia-
tion
152,458.55
219,541.91
CAPITAL
Capital Stock
100,000.00
100,000.00
Surplus
427,106.55
493,235.50
Total
$1,075,499.45
$1,048,826.85
*134 The salary of William S. Smith, as president of petitioner, was $32,400 in 1938, $30,000 in 1939, and $50,000 in 1940. In addition to his ownership of stock in petitioner, William S. Smith owned stock in Donegan Lumber Co., Bayou Steamship Corporation, and Raritan Steamship Corporation, among others, from which corporations he received substantial amounts of money. He and his wife each reported income and paid taxes as indicated below. Net
Normal
Income
Surtax Paid
Tax Paid
1938
$24,632.08
$1,658.95
$ 718.46
1939
34,207.42
3,413.06
1,092.97
In 1940, petitioner advanced money for the benefit of the Bayou Steamship Corporation for ship reconditioning in the total amount of $121,318.02, and for the Raritan Steamship Corporation in the amount of $124,686.32. These amounts were repaid to petitioner with reasonable promptness, but were outstanding on its books at the end of 1940 as accounts receivable. Petitioner retained as working capital the following percentage of its gross receipts during the years indicated: 1934
13 percent
1935
9 percent
1936
12 3/8 percent
1937
9 1/2 percent
1938
13 percent
1939
13 1/2 percent
Petitioner's earnings *135 and profits were not permitted to accumulate beyond the reasonable needs of the business. Petitioner was not availed of in 1938 and 1939 for the purpose of preventing the imposition of a surtax upon its shareholders. Opinion KERN, Judge: The only question presented for our determination is whether or not petitioner is liable for the tax imposed by section 102 of the Revenue Act of 1938 and the Internal Revenue Code, by reason of having been availed of during 1938 and 1939 for the purpose of preventing the imposition of surtaxes upon its shareholders through the medium of permitting its earnings and profits to accumulate instead of being divided or distributed. The respondent contends that the earnings and profits for 1938 and 1939, which amounted to $82,020.50 and $137,657.03, respectively, were accumulated beyond the reasonable needs of the business. He points out that no dividend was declared during 1938, and a dividend of only $10,000 was distributed in 1939; that petitioner's stock was almost entirely held by one individual, who would have been liable for greater surtaxes in the event of distribution; that petitioner's accumulated surplus amounted to $241,483.34 in 1938 and *136 $349,258.86 in 1939; that, despite the purchase of additional equipment, petitioner's cash position remained approximately the same with an unreasonably large amount of cash on hand; and that advances were made by petitioner to other companies in which petitioner's principal stockholder was interested. Petitioner contends that the earnings and profits of 1938 and 1939 were not accumulated beyond the reasonable needs of the business, but that they were accumulated because of the hazards of the business which required a large amount of cash on hand, the uncertainties incident to a war which petitioner's president had reason to foresee, and the necessity of purchasing new and additional equipment needed to handle new types of cargo and an increasing business. It relies on its undisputed showing that during 1938, when the surplus increased $65,447.87, $40,090.07 was spent for equipment; during 1939, when the surplus increased $107,775.52, $111,188.15 was spent for new equipment; and that during 1940 and 1941, when the surplus increased $143,976.64, a total of $246,589.16 was spent for equipment, pursuant to a program of expansion determined upon in 1938. After giving due consideration *137 to all the facts disclosed by the record, and after a careful examination of the applicable statutes and rules of law, we have reached the conclusion that the earnings and profits of petitioner were not permitted to accumulate beyond the reasonable needs of the business, that petitioner was not availed of during 1938 and 1939 for the purpose of preventing the imposition of the surtax upon its shareholders, and that it is not, therefore, liable for the tax imposed by section 102 of the Revenue Act of 1938 and the Internal Revenue Code. Decision will be entered under Rule 50. Footnotes
*. Sold S. S. Auditor for $83,600.00 Purchased Derrick Barge "Mammoth" $65,414.79↩
*. Includes gain of $55,733.23 on the sale of the S. S. Auditor↩
*. The exhibit from which these figures are taken is evidently in error in listing these amounts as "Lumber Purchases." The testimony of petitioner's accountant indicates that this item includes not only accounts payable for lumber purchases but also accident claims, customers' credit balances and trade accounts. The accident claims amounted to $47,620.98 as of December 31, 1938; to $66,577.02 as of December 31, 1939; to $101,253.70 as of December 31, 1940; and to $87,929.20 as of December 31, 1941.↩